# FOR PUBLICATION



ATTORNEY FOR APPELLANTS:

**CLIFFORD T. RUBENSTEIN**
Maurer Rifkin & Hill, P.C.
Carmel, Indiana

ATTORNEY FOR APPELLEE:

**JASON A. MOSBAUGH**
Weltman Weinberg & Reis Co., L.P.A.
Cincinnati, Ohio

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| KRISTINE A. and LARRY G. DAWSON, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| vs. | ) | No.  49A02-1107-PL-704 |
| | ) | |
| FIFTH THIRD BANK, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Theodore M. Sosin, Judge
Cause No.  49D02-1004-PL-17302

**March 30, 2012**

**OPINION – FOR PUBLICATION**

**DARDEN, Judge**

## STATEMENT OF THE CASE

Kristine A. Dawson and Larry G. Dawson (collectively "the Dawsons") appeal the trial court's order denying the Dawsons' motion for summary judgment and granting Fifth Third Bank's cross-motion for summary judgment.

We affirm.

## ISSUE

Whether the trial court erred by granting summary judgment to Fifth Third and by denying the Dawsons' motion for summary judgment.

## FACTS

This case arose after the Dawsons responded to a posting on Craigslist and purchased a Harley Davidson motorcycle ("the Motorcycle") from Jacob Magish. Although Magish gave the Dawsons a certificate of title that showed it was free of any lienholders, the Dawsons later learned that Magish had fraudulently obtained this apparent "clean" certificate of title and that the most current certificate of title issued by and on file with the Indiana Bureau of Motor Vehicles ("BMV") listed Fifth Third as a lienholder on the Motorcycle.

The Dawsons subsequently filed a complaint against Fifth Third, arguing that Fifth Third's lien against the Motorcycle should be unenforceable because, under a theory of equitable estoppel, Fifth Third should bear the loss of Magish's fraud on the Dawsons because Fifth Third's acts and omissions made the loss possible. Fifth Third filed a counterclaim, seeking replevin of the Motorcycle.

Thereafter the parties filed cross-motions for summary judgment and stipulated to the following facts:

1) In May 2006, Jacob J. Magish ("Magish") agreed to purchase a certain 2001 Harley-Davidson motorcycle, VIN 1HD1FCW151Y633745 ("Motorcycle"), from Christine and Larry Logsdon ("Logsdons") for $14,635.

2) Also on May 31, 2006, at a Fifth Third branch in Indianapolis, Magish executed a Simple Interest Note and Security Agreement in favor of Fifth Third in order to borrow $15,000 ("Transaction"). The Security Agreement granted Fifth Third a security interest in the Motorcycle. . . .

3) On May 31, 2006 and as part of the Transaction, Magish presented to Fifth Third the Logsdons' original Certificate of Title ("Logsdon Original Title"). . . .

4) On May 31, 2006 and as part of the Transaction, Magish executed, amongst other documents, an Application for Certificate of Title ("May 31 Application") and a Power of Attorney ("Magish File POA"). . . .

5) Pursuant to Fifth Third's procedure at that time, Fifth Third's Closing Representative John Wargel ("Wargel") copied the Logsdon Original Title and then gave the Logsdon Original Title back to Magish and instructed Magish to apply for a new title at the Bureau of Motor Vehicles ("BMV"). Wargel kept the May 31 Application and the Magish File POA in the loan file.

6) Shortly after the Transaction, Magish, using deception, approached the Logsdons and requested that they sign paperwork to obtain a duplicate title. The Logsdons, who had no knowledge that Magish had financed the purchase of the Motorcycle through Fifth Third, unwittingly signed an application to obtain a duplicate title and gave the application to Magish.

7) On or about June 8, 2006, Magish obtained a Duplicate Title from the BMV in the name of the Logsdons ("Logsdon Duplicate Title"). The Logsdons signed the Logsdon Duplicate Title as Sellers. The Logsdon Duplicate Title inactivated the Logsdon Original Title in the BMV records.

3

8) On or about June 20, 2006, Magish, using the Logsdon Duplicate Title, submitted an application to the BMV for a new title in his name ("June 20 Application"). Magish intentionally omitted Fifth Third from the June 20 Application and did not list a lienholder. Magish concurrently tendered the Logsdon Duplicate Title to the BMV and failed to notate Fifth Third as Lienholder in the Purchaser's Information section. . . .

9) On June 28, 2006, the BMV issued a new title in Magish's name ("First Magish Title"). There was no lien notated on the First Magish Title. The First Magish Title inactivated the Logsdon Duplicate Title in the BMV records. . . .

10) On or about October 16, 2006, Fifth Third[] used the Magish File POA and submitted an application for an amended title ("Fifth Third Application") to the BMV. . . Fifth Third did not have the Logsdon Original Title nor the First Magish Title in its possession and so did not tender to the BMV either with the Fifth Third application.

11) On October 18, 2006, the BMV issued a new title listing Magish as owner and Fifth Third as Lienholder ("Second Magish Title"). The Second Magish Title inactivated the First Magish Title in the BMV records. The whereabouts of the Second Magish Title are unknown and Fifth Third has no record of receiving it. The possible reasons for the missing Second Magish Title are: (1) it was mailed by the BMV but lost in the mail; (2) Fifth Third received it and lost it before making a record of receiving it; (3) the BMV printed the title but did not send it; or (4) the BMV sent it to Magish. The BMV's Title and Lien Record reflects the issuance of the Second Magish Title . . . .

12) In 2008, Magish defaulted under the terms of the Note by failing to make payments as they became due. On September 25, 2008, Fifth Third, by its undersigned counsel, filed a Complaint on Promissory Note and For Replevin under Marion Circuit Court Cause No. 49C01-0808-CC-043604 ("Replevin Case").

13) Magish appeared in the Replevin Case by attorney Steven Crell ("Attorney Crell") and filed a general denial Answer. On January 26, 2009, Fifth Third filed a Motion for Summary Judgment.

14) In response to the Motion for Summary Judgment, on February 24, 2009, Attorney Crell sent Fifth Third's counsel an email letter stating that the Motorcycle had been sold in South Carolina in 2007 after an

4

accident and that, according to Magish, there was no lien on the title at the time the title was transferred ("Email Letter"). . . .

15) Based on the representations made in the Email Letter and without further investigation, Fifth Third and Magish entered into a monthly payment arrangement on the outstanding balance of the note and the Replevin Case was subsequently dismissed via Stipulation, without prejudice.

16) On June 18, 2009, Magish sold and delivered the Motorcycle to the Dawsons after posting an advertisement on Craigslist. The Dawsons paid Magish $13,050.00 for the Motorcycle.

17) At the sale, Magish provided the Dawsons with the First Magish Title. The Dawsons did not check the BMV records prior to the sale to verify the current status of the title to the Motorcycle.

18) After the sale, the Dawsons submitted an application for a new title to the Motorcycle to the BMV. The BMV advised the Dawsons that, according to the BMV records, the title the Dawsons had was not the most current title. For privacy reasons the BMV would not tell the Dawsons exactly what the issue was, but said it was either there was a duplicate title or a lienholder on the title. After discussions with Magish and his wife, the Dawsons determined that Fifth Third was a lienholder. The BMV refused to issue a new title to the Motorcycle to the Dawsons.

19) The Dawsons called Magish (who at the time was terminally ill) and spoke with Magish'[s] wife who said that Magish would "take care" of the problem. Magish died on or about August 5, 2009. No estate was opened.

20) The Dawsons are still in possession of the Motorcycle.

21) The Dawsons filed the within Complaint to have Fifth Third's lien declared unenforceable so that they can get a clear title to the Motorcycle. Fifth Third has filed a Counterclaim for Replevin. Both parties assert a superior interest in the Motorcycle.

(App. 18-20). The parties also stipulated that the question of law before the trial court on summary judgment was the following: "Based on the facts set forth above, and as a

5

result of the fraud of Magish in obtaining multiple titles to the Motorcycle, which party is entitled to possession and title of the Motorcycle, free and clear of all liens and encumbrances?" (App. 20).

The trial court held a hearing on the summary judgment motions on November 22, 2010.[1] The trial court ultimately denied the Dawsons' summary judgment motion, granted Fifth Third's summary judgment motion, awarded permanent possession of the Motorcycle to Fifth Third, and ordered that the Dawsons maintain possession of the Motorcycle pending their appeal.[2]

## DECISION

The Dawsons argue that the trial court erred by granting Fifth Third's motion for summary judgment and by denying their motion for summary judgment. Specifically, the Dawsons argue that Fifth Third failed to satisfy all the elements of its counterclaim for replevin and that they are entitled to summary judgment on their claim of equitable estoppel.

The standard of review of a summary judgment is the same as that used in the trial court. *Kopczynski v. Barger*, 887 N.E.2d 928, 930 (Ind. 2008). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* "[T]he party seeking summary judgment has the initial burden of proving the absence of a genuine issue of material fact as to an outcome-determinative issue. Only then must the non-movant come forward with

---

[1] The record before us does not contain a transcript of the summary judgment hearing.

[2] The entry of a final judgment and the filing of the notice of appeal were delayed by some procedural irregularities that are not being challenged and are not at issue in this appeal.

6

contrary evidence demonstrating the existence of genuine factual issues that should be resolved at trial." *Kroger Co. v. Plonski*, 930 N.E.2d 1, 9 (Ind. 2010) (citing *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 123 (Ind. 1994), *reh'g denied*). "A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where undisputed facts are capable of supporting conflicting inferences on such an issue." *Mahan v. Am. Standard Ins. Co.*, 862 N.E.2d 669, 675 (Ind. Ct. App. 2007), *trans. denied*. Even if the facts are undisputed, as they are in this appeal, summary judgment is inappropriate where the record reveals an incorrect application of the law. *Masten v. AMCO Ins. Co.*, 953 N.E.2d 566, 569 (Ind. Ct. App. 2011), *trans. denied*.

The fact that the parties filed cross-motions for summary judgment does not alter our standard of review. *Pond v. McNellis*, 845 N.E.2d 1043, 1053 (Ind. Ct. App. 2006), *trans. denied*. We consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.*

We first review the trial court's grant of summary judgment to Fifth Third on its counterclaim for replevin. "A replevin action is a speedy statutory remedy designed to allow one to recover possession of property wrongfully held or detained as well as any damages incidental to the detention." *United Farm Family Mut. Ins. Co. v. Michalski*, 814 N.E.2d 1060, 1066 (Ind. Ct. App. 2004). *See also* Ind. Code § 32–35–2–1 (providing that where property is wrongfully taken or unlawfully detained from the owner or person claiming possession of the property, the owner or claimant may bring an action for possession of the property). To recover in an action for replevin, a plaintiff must prove

7

his title or right to possession; that the property is unlawfully detained; and that the defendant wrongfully holds possession. *United Farm Family*, 814 N.E.2d at 1067; *Deere & Co. v. New Holland Rochester, Inc.*, 935 N.E.2d 267, 269 (Ind. Ct. App. 2010).

The stipulated facts show that Fifth Third obtained a security interest in the Motorcycle in 2006 after Magish signed the Simple Interest Note and Security Agreement ("Security Agreement") and pledged the Motorcycle as collateral for his loan with Fifth Third. The stipulated facts also indicate that the most current certificate of title to the Motorcycle that was issued by and on file with the BMV reflects that security interest, and it indicates that Fifth Third is a lienholder on the Motorcycle. The Dawsons acknowledge that, pursuant to the terms of the Security Agreement, Fifth Third has a right to repossess the Motorcycle upon default by Magish, and the parties stipulated to the fact that Magish defaulted on the Security Agreement in 2008 when he failed to make payments to Fifth Third. The parties do not dispute that Fifth Third has not released its lien on the Motorcycle. At the time the Dawsons purchased the Motorcycle, they did not check with the BMV to verify that the certificate of title that Magish gave them was the most recent one; thus, they were unaware of Fifth Third's lien on the Motorcycle. However, after learning that Fifth Third was a lienholder on the Motorcycle, the Dawsons have not paid Fifth Third to release the lien but have retained possession of the Motorcycle.

"It is black letter law that, upon default, a secured creditor has the right to take possession of the collateral securing its claim and the rights set forth in the agreement with the defaulting party." *Deere*, 935 N.E.2d at 269 (citing Ind. Code §§ 26–1–9.1–

8

601(a), 26-1-9.1-609(a)(1)).[3]   Therefore, when Magish defaulted on his loan, Fifth Third, as the secured party, had a right to take possession of the Motorcycle.  *See* Ind. Code § 26–1–9.1–609(a); *see also Allen v. First Nat. Bank of Monterey*, 845 N.E.2d 1082, 1085 (Ind. Ct. App. 2006).

The Dawsons do not dispute the fact that Fifth Third had a right to possession of the Motorcycle based on its security interest and lien on the Motorcycle.  Instead, they contend that their purchase, and resulting ownership, of the Motorcycle, precludes Fifth Third from being able to prove that the Dawsons wrongfully held possession of the Motorcycle.  Fifth Third does not contest the Dawsons' ownership of the Motorcycle but contends that such ownership is subject to Fifth Third's lien, which upon Magish's default, entitles Fifth Third to replevin the Motorcycle.  We agree with Fifth Third.

A security agreement is effective against purchasers of the collateral.  *See* I.C. § 26-1-9.1-201; *see also Deere*, 935 N.E.2d at 269 (holding that a business that had a perfected security interest in farm equipment was entitled to replevin of equipment from third-party purchaser of the collateral equipment when debtor defaulted); *Allen*, 845 N.E.2d at 1085 (holding that the bank's perfected security interest in farm equipment was superior to the debtor's father who took over payments on the collateral equipment and that bank had right to possession of collateral upon default of the debtor).

The stipulated facts show that Magish pledged the Motorcycle as collateral for his loan with Fifth Third; that the certificate of title, which had been on file with the BMV

---

[3] Indiana Code section 26-1-9.1-601(a) provides, in relevant part, that "[a]fter default, a secured party . . . may reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest . . . by any available judicial procedure[.]"  Indiana Code section 26-1-9.1-609(a)(1) provides that "[a]fter default, a secured party . . . may take possession of the collateral."

since October 18, 2006 and was on file when the Dawsons purchased the Motorcycle on June 18, 2009, reflected Fifth Third as lienholder; that Magish defaulted on the loan; and that the lien has not been released. Despite subsequently learning of Fifth Third's lien and acknowledging its right to repossess the Motorcycle, the Dawsons have maintained possession of the Motorcycle. While the Dawsons had an interest in the Motorcycle as purchasers of the collateral, their interest was not superior to Fifth Third's perfected security interest[4] in the Motorcycle. *See Allen*, 845 N.E.2d at 1085; *see also Deere*, 935 N.E.2d at 269. Accordingly, we conclude that the trial court did not err by concluding that Fifth Third, as lienholder of the Motorcycle, had a right to replevin of the Motorcycle

[4] As part of their own motion for summary judgment, the Dawsons suggest that Fifth Third had not perfected its security interest. Specifically, the Dawsons contend that Fifth Third did not comply with Indiana Code section 9-17-2-4 because it failed to submit the previously issued certificate of title with its application for a new certificate of title. Indiana Code section 9-17-2-4 provides that if a certificate of title "has been previously issued for a vehicle in Indiana, an application for a certificate of title must be accompanied by the previously issued certificate of title, unless otherwise provided[.]" (Emphasis added). Indiana Code § 9-17-3-2 provides that a duplicate copy of a certificate of title may be obtained without submitting a previously issued title, such as when the certificate of title is lost. *See* I.C. § 9-17-3-2. The stipulated facts reveal that when Fifth Third applied for a new certificate of title that would correctly reflect it as the lienholder, it did not have the previously issued certificate of title. Thereafter, the BMV issued a new certificate of title, noting Fifth Third as a first lienholder. Because the certificate of title indicates that Fifth Third has a lien on the Motorcycle, Fifth Third has perfected its security interest. *See* 26-1-9.1-311(a) (explaining that the filing of a financing statement is not necessary to perfect a security interest in an automobile because the certificate of title statute covering automobiles "provides for a security interest to be indicated on a certificate of title as a condition or result of perfection"); *see also Conseco Fin. Servicing Corp. v. Old Nat'l Bank*, 754 N.E.2d 997, 1001 (Ind. Ct. App. 2001) (interpreting Indiana Code section 26-1-9.1-311(a)(2) and explaining that perfection occurs when the security interest is indicated on the certificate of title); *Sterling v. Capital Fin. Servs., Inc.*, 480 N.E.2d 605, 606 (Ind. Ct. App. 1985) (suggesting that a security interest in a motor vehicle is perfected when a secured party is identified as a lienholder on a certificate of title submitted to the BMV), *reh'g denied*, *trans. denied*. Furthermore, Indiana Code § 26-1-9.1-311(b) provides that once a security interest in goods covered by a certificate of title is perfected, "a security interest so perfected remains perfected notwithstanding a change in the use or transfer of possession of the collateral." Finally, we reject the Dawsons' attempt to raise in this appeal, what is in essence, a challenge to the BMV's discretion to issue a certificate of title. *See Flynn v. Ind. Bureau of Motor Vehicles*, 716 N.E.2d 988, 992 (Ind. Ct. App. 1999) (explaining that a party may challenge the BMV's discretion to issue a certificate of title by seeking judicial review of an agency action), *trans. denied*.

from the Dawsons.  Thus, we affirm the trial court's grant of summary judgment to Fifth Third on its counterclaim for replevin.

We next turn to the Dawsons' argument that the trial court erred by denying their summary judgment motion on their claim for equitable estoppel.  The Dawsons argue that, despite Fifth Third's lien, they are entitled to own the Motorcycle free and clear of such lien based on equitable principles.  Specifically, the Dawsons assert that the following equitable principles should apply: (1) when one of two innocent parties must suffer a loss, that loss must be borne by the party whose act or omission made the loss possible;[5] and (2) equity aids the vigilant, not those who slumber on their rights.  In other words, the Dawsons contend that Fifth Third should bear the loss of the fraud Magish perpetrated on them because Fifth Third's acts or omissions allowed Magish to obtain a certificate of title that did not reflect Fifth Third's lien and thereafter allowed him to sell the Motorcycle to the Dawsons without their knowledge of Fifth Third's lien.  In so arguing, the Dawsons list various things that they contend Fifth Third did or did not do— such as returning the original certificate of title (or the Original Logsdon Title) to Magish so that he could apply for a certificate of title and failing in its duty to protect its own interests in the lien—and argue that Fifth Third could have prevented the Dawsons' loss.

The Dawsons do not cite to any authority that Fifth Third was required to retain the Original Logsdon Title or that it was required to apply for the new certificate of title itself.  Indeed, the statutes pertaining to procedure for obtaining certificates of title do not require a bank to apply for the certificate of title, and we have explained that "[o]ur law

---

[5] The Dawsons fail to cite to any caselaw discussing this equitable principle.

neither requires nor expressly authorizes one lending money on the security of a motor vehicle to take up and hold the certificate of title until the lien has been discharged." *Community State Bank v. Crissinger*, 120 Ind. Ap. 25, 29, 89 N.E.2d 78, 80 (1949).

Here, the stipulated facts reveal that on May 31, 2006, when Magish signed the security agreement with Fifth Third and pledged the Motorcycle as collateral, Fifth Third noted its lien on both the Original Logsdon Title and the application for the certificate of title and returned them to Magish so that he could get a new certificate of title, which he never did. Within four and one-half months, after apparently learning that Magish had not obtained a certificate of title that reflected its security interest, Fifth Third applied for an amended certificate of title, and the BMV issued a new title that listed Fifth Third as a lienholder on the Motorcycle. Thus, Fifth Third took appropriate action to protect its lien as well as make others aware of the lien. *See Flynn*, 716 N.E.2d at 991 ("The requirement that vehicles be titled serves the purpose of protecting the owners of motor vehicles, persons holding liens thereon, and the public in transactions involving vehicles."). It is undisputed that Fifth Third never released its lien, and the Dawsons do not present any evidence or argue that it was required to do so.

Furthermore, contrary to the Dawsons' contention otherwise, the stipulated facts do not show that it was merely Fifth Third's acts that made the Dawsons' loss—which was their purchase of the Motorcycle without knowledge of Fifth Third's lien—possible. To be sure, when looking at the Dawsons' acts and omissions, we cannot say that the trial court erred by denying their summary judgment motion based on equitable estoppel. The record reveals that the Dawsons purchased the Motorcycle after seeing Magish's post on

12

Craigslist, and there is no evidence presented that they knew Magish or had any previous dealings or interactions with him. Despite this apparent lack of familiarity with Magish, the Dawsons did not check the BMV to verify the status of the certificate of title that Magish presented to them. Indeed, there would have been little effort on their part to do so, and the record suggests that the Dawsons were in a better position to protect themselves from a loss. "As a general rule, we find that it is unreasonable to rely on the statements of third parties—or the debtor—about the current status of security interests." *Deere*, 935 N.E.2d at 270.

Given the stipulated facts presented in this case, we cannot say that the Dawsons have met their burden of proving that they were entitled to summary judgment. Aside from the fact that they have cited little to no caselaw to support their arguments, they have failed to show that Fifth Third's acts or omissions were responsible for their loss by purchasing the Motorcycle without knowledge of Fifth Third's lien to the extent that equity should be granted to them. Accordingly, we affirm the trial court's denial of the Dawsons' motion for summary judgment.[6]

Affirmed.

FRIEDLANDER, J., and VAIDIK, J., concur.

---

[6] The Dawsons also argue that, pursuant to the Indiana Uniform Fraudulent Transfer Act ("IUFTA"), Magish's sale of the Motorcycle to the Dawsons was not voidable. We need not review this claim because the IUFTA applies to <u>creditors</u>. *See* Ind. Code §§ 32-18-2 *et seq.*; *see also Rice v. Com'r, Ind. Dep't. of Envtl. Mgmt.*, 782 N.E.2d 1000, 1005 (Ind. Ct. App. 2003) (explaining that a motion to set aside fraudulent conveyances pursuant to the IUFTA is equitable remedy available to "frustrated creditors").